UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
DANIEL WIESE,

                                  Plaintiff,

              - against -                                08-CV-6348 (CS)

ROGER B. KELLEY,                                **MEMORANDUM DECISION
                                                                          AND ORDER**

                                  Defendant.
------------------------------------------------------------------------x
Appearances:

Jonathan Lovett, Esq.
Lovett & Bellantoni, LLP
White Plains, NY
*Counsel for Plaintiff*

Lance H. Klein, Esq.,
Edward J. Phillips, Esq.
Keane & Beane, P.C.
White Plains, NY
*Counsel for Defendant.*

Seibel, J.

       Plaintiff Daniel Wiese commenced this action against Defendant Roger Kelley, former President and Chief Executive Officer of the New York State Power Authority ("NYPA" or the "Authority"), Plaintiff's former employer, on July 15, 2008. He alleges, pursuant to 42 U.S.C. § 1983, that statements made public by Defendant during the course of his termination violated his Due Process rights. Defendant has moved to dismiss Plaintiff's Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) For the reasons stated below, Defendant's Motion is GRANTED.

**I.**      **Background**

       This action arises from the events leading up to Plaintiff's termination from the NYPA in

May 2008 and related political intrigue surrounding a local scandal dubbed by the media as "Troopergate." The following facts are drawn from Plaintiff's Amended Complaint (Doc. 6), and are accepted as true for the purposes of Defendant's Motion to Dismiss.

Immediately prior to joining the NYPA, Plaintiff Daniel Wiese was employed by the New York State Police, and in 2002 retired, apparently without controversy, with the rank of Assistant Deputy Superintendent/Lieutenant Colonel. (Am. Compl. ¶ 3.) After leaving the New York State Police, Wiese served as Inspector General and Vice President of Corporate Security (IG/VP) at the NYPA from 2003 until his termination on May 23, 2008. (*Id.* ¶¶ 3, 14.) On April 3, 2008, Defendant Roger Kelley informed Wiese by letter that the New York State Attorney General had commenced an investigation "in connection with which [Wiese] . . . and Authority documents had been subpoenaed." (*Id.* ¶ 5.) As a result of the investigation, and in light of the sensitive nature of Wiese's position, Kelley advised that he would be immediately "i) placed on administrative leave with pay; ii) forbidden access to information and assets of the Authority; iii) required to relinquish his keys, key cards, computers, blackberrys [*sic*] . . . passwords, Authority vehicle and any other property of the Authority in his possession." (*Id.*) The April 3, 2008 correspondence was allegedly provided by Kelley or his subordinate to Fredric U. Dicker, a reporter for the *New York Post*. (*Id.* ¶ 6.) On April 5, 2008, the *Post* ran a piece by Dicker identifying Wiese by name, describing him as "[a] former State Police colonel under investigation for possible involvement with a renegade unit involved in political dirty tricks," and stating that investigators sought to determine if Wiese "had a role in . . . political espionage operations." (*Id.* ¶ 7.) Wiese denies playing any such role. (*Id.*)

On May 6, 2008, New York State Attorney General Andrew Cuomo wrote to Kelley advising that his office was "conducting an investigation of the New York State Police," and had "issued subpoenas to the [NYPA]." (*Id.* ¶ 8.) During the course of the investigation, Cuomo wrote, his office "learned that affirmative steps were taken by NYPA personnel to purposefully destroy responsive information, specifically, e-mails on the blackberry [*sic*] of Daniel Wiese . . . . This destruction took place on April 1, 2008, the day this investigation was announced in the media." (*Id.*) Cuomo wrote that the missing emails were "relevant to [the] investigation," and "request[ed] that [Kelley] take any and all steps necessary to recover the deleted Wiese e-mails and provide them to [the Attorney General's] Office immediately upon their recovery." (*Id.*) As with the April 3, 2008 correspondence, the May 6, 2008 correspondence was allegedly leaked to the press by Kelley or subordinates acting at his direction. (*Id.* ¶ 9.) A May 8, 2008 *New York Post* piece by Dicker revealed the destruction of the Wiese emails, quoted portions of the May 6, 2008 letter from the Attorney General, and reported that "the NYPA announced that, in light of Cuomo's letter, it had changed Wiese's status from suspended with pay to suspended without pay from his $180,000-a-year job." (*Id.*) The May 8 Dicker article also contained a statement from Christine Pritchard, Kelley's spokesperson, that the NYPA would "do everything in [its] power to get to the bottom of the matter and take appropriate action, including holding accountable any personnel who acted in an inappropriate manner." (*Id.*) Plaintiff also alleges that Kelley leaked to Dicker a May 7, 2008 letter from Kelley informing Wiese that as of May 7, 2008, he would be placed on an unpaid leave of absence from his position as IG/VP at the NYPA. (*Id.* ¶ 10)

Another Dicker article, titled "Something rotten in state police," appeared in the *New York Post* on May 10, 2008, and reported further upon Wiese's suspension without pay and the Attorney General's ongoing investigation. (*Id.* ¶ 11.) The May 10 Dicker piece described Plaintiff as "shadowy," and "[a] central figure in the suspected conspiracy." (*Id.*) The loss of data on Wiese's BlackBerry, Dicker wrote, was an "outrage," and those implicated in the deliberate data loss "should immediately lose their jobs and, quite possibly, face jail time." (*Id.*)

Plaintiff does not dispute that data on his BlackBerry was, in fact, lost. Plaintiff alleges, however, that he "did not delete (nor cause anyone to delete) and [*sic*] e-mails, past or present," and that "no e-mails were deleted as stated in Cuomo's [May 6, 2008] correspondence." (*Id.* ¶ 8.) Rather, Plaintiff claims that any loss of data was accidental, not directly attributable to him, and the result of advice from an NYPA technology specialist named Dominick Daniello. (Am. Compl. ¶ 12.) Apparently, Plaintiff's "BlackBerry had effectively 'frozen,'" and only after "numerous attempts to correct its malfunction were unsuccessful" did Daniello "determine[] that the BlackBerry could only be 'unfrozen' by 're-booting' it," an "action that would result in the deletion of all information stored in the BlackBerry," but not the deletion of backed-up emails and data that remained on NYPA's servers. (*Id.*)

On May 19, 2008, Wiese sent an email to Kelley and members of the Authority's Board of Trustees requesting they publicly disclose the "facts" relating to the alleged destruction of emails. No such disclosure was made by Kelley or the Authority. (*Id.* ¶ 12.) That same day, the *New York Post* published an article in which Dicker reported that Attorney General Cuomo had convened a Grand Jury in connection with the ongoing investigation. (*Id.* ¶ 13.)

4

By letter dated May 22, 2008, Kelley notified Wiese – who does not dispute that he was an at-will employee – that his employment with the NYPA was being terminated. (*Id*. ¶ 14.) An article written by Dicker and appearing in the *New York Post* the following day reported that "[t]he former trooper at the center of allegations that a rogue state police unit did dirty tricks for two New York governors has been fired from his job at the [NYPA]." (*Id.* ¶ 16.) Plaintiff alleges that this information was also obtained courtesy of a leak from Kelley's office.[1] Plaintiff further alleges that the leaks were pursuant to a plan by Kelley to smear Plaintiff, fire him, and make it impossible for him to find a new job. (*Id.* ¶ 4.) He does not suggest what Kelley's motive for such conduct might be.

Plaintiff's Amended Complaint alleges that copies of the Dicker articles, which contained unflattering characterizations of Plaintiff and his actions, were maintained in his personnel file. Plaintiff was not afforded a hearing prior to or after his termination from employment with the NYPA. (*Id*. ¶ 18.)

II.     **Discussion**

  A.     **Standard of Review for a Motion to Dismiss**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim

---

[1] The April 3, 2008, May 7, 2008, and May 22, 2008 letters from Kelley to Wiese, along with the May 6, 2008 letter from Attorney General Cuomo (together, hereinafter the "Wiese letters") comprise the totality of allegedly stigmatizing correspondence leaked to the press. Similarly, the April 5, 2008, May 8, 2008, May 10, 2008, May 19, 2008, and May 23, 2008 *New York Post* articles (hereinafter, the "Dicker articles"), are the only articles Plaintiff identifies in his Complaint as stigmatizing.

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations and quotation marks omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S. Ct. at 1950.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing co-urt to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

    **B.**    **Plaintiff's "Stigma-Plus" Claim**

Under the Due Process Clause of the Fourteenth Amendment, "a person must be afforded the opportunity for a hearing prior to being deprived of a constitutionally protected liberty or property interest." *Patterson v. City of Utica,* 370 F.3d 322, 329 (2d Cir. 2004). "A

person's interest in his or her good reputation alone . . . is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under [42 U.S.C.] § 1983." *Id.* at 329-30.  Loss of one's reputation is, however, sufficient to invoke the protections of the Due Process Clause when "that loss is coupled with the deprivation of a more tangible interest, such as government employment." *Id.*  To prevail on a "stigma-plus" claim,[2] a plaintiff must demonstrate that the government: (1) made stigmatizing statements about the plaintiff that were at least arguably false and called into question the plaintiff's "good name, reputation, honor, or integrity," or "denigrate[d] [his] competence as a professional and impugn[ed] [his] professional reputation in such a fashion as to effectively put a significant roadblock in [his] continued ability to practice his . . . profession;" (2) made those statements public; and (3) made the statements "concurrently in time to plaintiff's dismissal." *Id*.  In such circumstances, a plaintiff is entitled to a name-clearing hearing at which he could attempt to establish the falsity of the statements.  "There is no requirement that in order to succeed on a stigma-plus claim a plaintiff must produce an explicit public statement by a municipal official accusing the discharged employee of immoral or illegal conduct."  *Id.* (internal quotation marks omitted).  Indeed,  "[a] subtle campaign designed by . . . officials to make plaintiff the scapegoat for an episode of municipal misfeasance may impose no less an indelible stigma than a public proclamation announced at high noon from the steps of City Hall."  *Id.* (internal quotation marks omitted).

---

[2] The term "stigma-plus" refers "to a claim brought for injury to one's reputation (the stigma) coupled with the deprivation of some tangible interest . . . (the plus), without adequate process."  *DiBlasio v. Novello,* 344 F.3d 292, 302  (2d Cir. 2003); *see Velez v. Levy,* 401 F.3d 75, 87 (2d Cir. 2005) ("A § 1983 liberty interest claim . . . [is] commonly referred to as a 'stigma plus' claim." (internal citation omitted)).

7

It is undisputed that Plaintiff suffered the loss of a tangible interest when he was publicly dismissed from his role at the Authority.  Nor does Defendant, for purposes of this motion, seem to dispute that the allegedly stigmatizing articles appeared in the *New York Post* in conjunction with Plaintiff's termination in May 2008.  But Defendant asserts that Plaintiff's liberty interest is not implicated because the statements allegedly leaked to Dicker were true,  (Memorandum of Law In Support of Defendant's Motion to Dismiss the Amended Complaint ("Def.'s Mem.") 15), and that even if the Amended Complaint set forth a viable stigma-plus claim, he is entitled to qualified immunity because Plaintiff's claim does not allege the violation of any "clearly established" constitutional right,  (*Id*. 23).

> 1. **Falsity of Statements**
>
>> a. **Wiese Letters**

At the core of Defendant's Motion is the argument that nothing Defendant uttered or allegedly communicated to the press was untrue.  Although Plaintiff need not prove that the stigmatizing statements were false, he must be able "to raise the falsity of [the] stigmatizing statements as an issue." *Patterson,* 370 F.3d at 330.  Moreover,  "in order to be stigmatized enough to be unconstitutionally deprived of liberty," Plaintiff "must show that [ ]he was dismissed amid allegations of dishonest, illegal or immoral conduct." *Garrett v. Mazza*, No. 97-CV-9148, 2001 WL 123862, at *6 (S.D.N.Y. Feb. 13, 2001); *see Nauta v. City of Poughkeepsie,* 610 F. Supp. 980, 985 (S.D.N.Y. 1985) (accusations of inefficiency and incompetence not sufficient for stigma-plus claim).

With these guidelines in mind, the Court finds that Plaintiff's Amended Complaint fails to allege a stigma-plus claim, as none of the statements allegedly leaked to the press by

8

Defendant contain facts capable of being proven false. Three of the letters Plaintiff identifies in the Amended Complaint merely announced changes to his employment status. The April 3, 2008 letter informed Plaintiff that as a result of the Attorney General's investigation and in light of the nature of Plaintiff's duties, he was (1) being placed on administrative leave, (2) to relinquish NYPA assets in his possession, and (3) not to visit Authority facilities.  (Am. Compl. ¶ 5.)  The NYPA spokesperson's statement merely confirmed the letter's content. Nothing in that letter or statement contained charges that Wiese was "guilty of dishonesty or immorality," or accusations that "call[ed] into question the [Wiese]'s good name, reputation, honor, or integrity." *Brandt v. Bd. of Co-op. Educ. Servs.,* 820 F.2d 41, 43 (2d Cir. 1987) (internal quotation marks omitted). The May 7, 2008 letter changed the status of Plaintiff's administrative leave from paid to unpaid, a move publicly announced by the NYPA, which also stated its unobjectionable intention "to get to the bottom" of the email deletions and hold accountable "any personnel" who acted inappropriately.  (Am. Compl. ¶ 9.)  The May 22, 2008 letter discharged Plaintiff from employment with the NYPA. Courts have consistently held that statements announcing personnel decisions, even when leaked to the press, and even when a reader might infer something unfavorable about the employee, are not actionable. *See O'Connor v. Pierson,* 426 F.3d 187, 195 (2d Cir. 2005) (negative inferences that might be drawn from plaintiff's suspension "not enough to make out a stigma-plus claim"); *Pisani v. Westchester County Health Care Corp.,* 424 F. Supp. 2d 710, 717 (S.D.N.Y. 2006) (court cannot "attach a defamatory implication to a simple and truthful statement of termination"); *Esposito v. Metro-North Commuter R..R. Co.*, 856 F. Supp. 799, 805 (S.D.N.Y. 1994) ("[W]here a defendant terminates an employee and makes only truthful public statements courts have found that no stigma-based

due process claim may be stated." (internal citation omitted));  *see also Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 177 (2d Cir. 1991) ("We cannot agree that the innuendo – if any – that stems from a without-cause termination is tantamount to a false accusation by defendants."); *Flood v. County of Suffolk,* 820 F. Supp. 709, 715 (E.D.N.Y. 1993) ("Even assuming that [Defendant's] alleged statement[s] regarding [Plaintiff] . . . [were] stigmatizing and may foreclose future employment opportunities, [P]laintiff's liberty interest is not implicated where the defamatory statement is substantially true.").  Moreover, none of the letters announcing changes to Wiese's job status at the Authority contained any "allegations of dishonest, illegal or immoral conduct." *Garrett*, 2001 WL 123862, at *6.  Rather, they were leaked, if at all, with only the Attorney General's subpoena of Authority documents – part of an investigation not limited to Plaintiff or the Authority's activities – as the relevant backdrop.  Because the Wiese letters contained no information capable of being proved false, and do not contain allegations of "dishonest, illegal, or immoral conduct[,]" they were not stigmatizing.

Nor are true public statements that a party is under investigation stigmatizing.  *See Powers v. Coe*, 728 F.2d 97, 105 (2d Cir. 1984) (leak of true stigmatizing grand jury information to media does not implicate due process clause);  *Smith v. Lehman,* 689 F.2d 342, 346 (2d Cir. 1982) (plaintiff's liberty interest claim without merit where he cannot challenge substantial accuracy of charges against him); *Felde v. Town of Brookfield,* 570 F. Supp. 2d 1070, 1076 (E.D. Wis. 2008) (true statement that plaintiff "was under investigation" not stigmatizing);  *Halverson v. Univ. of Utah Sch. of Med.*, No. 06-CV-228, 2007 WL 2892633, at *17 (D. Utah Sept. 28, 2007) ("Statements that an employee is under investigation when such statements are true is not stigmatizing and do not show a violation of a liberty interest.");  *Burnett v. Sch. Dist. of*

10

*Cheltenham Twp.*, No. 04-CV-2680, 2006 WL 2034700, at *14 (E.D. Pa. July 19, 2006) ("[P]laintiff fail[s] to show a deprivation of his liberty interests [when] . . . municipal employer's allegedly stigmatizing statement – that he was the subject of a criminal investigation – was true."); *John Gil Constr., Inc. v. Riverso*, 99 F. Supp. 2d 345, 355 (S.D.N.Y. 2000) (notification by defendant that Department of Investigation "was conducting a criminal investigation of plaintiff . . . is merely a statement of fact and cannot give rise to a liberty-interest due process violation"); *see also Houghton v. Cardone*, 295 F. Supp. 2d 268, 274 (W.D.N.Y. 2003) ("[I]f all that defendants did was report the fact of plaintiff's arrest, and that he was *alleged* to have committed a crime, that would not be defamatory."). Even the May 6, 2008 letter from the Attorney General's Office, which Plaintiff alleges Defendant provided to Dicker,[3] did not accuse Wiese of any wrongdoing or even state that he was under investigation. Rather, it provided that during the course of the Attorney General's review of "some of the materials produced by NYPA in response to the Subpoenas," it was discovered that "affirmative steps were taken by *NYPA personnel* to purposefully destroy responsive information, specifically, e-mails on the blackberry [*sic*] of Daniel Wiese." (Am. Compl. ¶ 8 (emphasis added).) The letter characterized such

---

[3] It is of note, although not addressed in the Parties' moving papers, that the May 6, 2008 letter advising Kelley that "NYPA personnel" had "purposefully destroy[ed]" e-mails on Daniel Wiese's BlackBerry was made available, in its entirety, on the New York State Attorney General's website. Letter from Attorney General Andrew Cuomo to Roger Kelley (May 6, 2008), http://www.oag.state.ny.us/media_center/2008/may/05.06.08Letter.pdf (last visited September 10, 2009). The letter apparently appeared on the Attorney General's website on May 7, 2008, a day after it was sent to Kelley, and a day before Dicker's article appeared. *See* May 7, 2008 News from the Media Center for the Office of the Attorney General (May 7, 2008), http://www.oag.state.ny.us/media_center/2008/may/may6b_08.html (last visited September 10, 2009).

conduct as "extremely troubling," and requested the NYPA's assistance in restoring lost data. (*Id.*)

Plaintiff asserts that "anyone with even the most nominal comprehension of the New York State Penal Law and the English language would fully and immediately appreciate" that the May 6, 2008 letter "accuse[s] Wiese . . . of having engaged in . . . unlawful conduct." (Pl.'s Mem. 16.)  At the risk of calling into doubt its command of the English language, the Court disagrees.  The Attorney General's letter merely states that:  (1) it "learned that affirmative steps" were taken by "NYPA personnel" to "purposefully destroy responsive information," (2) the lost information consisted of emails on Daniel Wiese's BlackBerry, and (3) the NYPA's "IT system" deleted past e-mails from Wiese's computer system.[4]  (*Id.*)  It rather pointedly does not accuse anyone in particular, and indeed seeks the NYPA's help in identifying those involved. (Declaration of Lance H. Klein in Support of Def.'s Mem. Ex. C.)  Likewise, the NYPA's spokesperson's comment about getting to the bottom of the matter carefully avoids specifying anyone in particular.  While a reader might infer that Wiese might be among those under investigation, such a conclusion is not stigmatizing where, as explained above, it is true.  Further, reassuring the public that it is diligently investigating whether any of its personnel were engaged in wrongdoing is an appropriate function of a public agency, and such comments should not be discouraged.  If such a statement by a government executive "automatically triggered a formal trial-type hearing, executives would be tempted to refrain from explaining their personnel

---

[4] Plaintiff does not dispute that emails were deleted; nor does he dispute that the deleted emails were his; and he concedes that his BlackBerry emails were deleted at the direction of "NYPA personnel." (Am. Compl. ¶ 12.)

actions in public, a result contrary to the strong policy of maintaining an informed electorate." *Baden v. Koch*, 799 F.2d 825, 833 (2d Cir. 1986).

The Attorney General's description of the conduct resulting in the loss of data as "extremely troubling" is a statement of opinion, rather than fact, and as such is not actionable as a stigmatizing remark. *See Blackburn v. City of Marshall,* 42. F.3d 925, 936 (5th Cir. 1995) (statement of opinion does not suffice to support stigma-plus claim because it does not contain "false factual representations, concrete or otherwise" (quoting *Connelly v. Comptroller of the Currency*, 876 F.2d 1209, 1215 (5th Cir. 1989)); *Palka v. Cook County,* No. 07-CV-5432, 2008 WL 5263436, at *10 (N.D. Ill. Dec. 17, 2008) ("[S]tatements made by a public official must be false assertions of fact; neither 'true but stigmatizing' statements nor 'statements of opinion, even stigmatizing ones' will suffice to meet [the stigma-plus] standard." (quoting *Strasburger v. Bd. of Educ*., 143 F.3d 351, 356 (7th Cir. 1998))). More importantly, however, the letter does not sufficiently identify Plaintiff as the culprit in any "extremely troubling" conduct; it instead merely states that "NYPA personnel" was responsible for the deletion of emails from Plaintiff's BlackBerry, a fact not in dispute. *See Algarin v. Town of Wallkill,* 421 F.3d 137, 139 (2d Cir. 2005) ("'[A]n individual plaintiff must be clearly identifiable [in an allegedly defamatory statement] to support a claim for defamation.'" (quoting *Abramson v. Pataki,* 278 F.3d 93, 102 (2d Cir. 2002)) (alterations in *Algarin*)).

Where "defendant['s] statements [are] substantially true and thus not capable of being proved false, plaintiff's liberty interest claim . . . fails." *Pisani*, 424 F. Supp. 2d at 718. No facts contained in the letters from Kelley to Wiese are in dispute, and the spokesperson's comments about the letters conform to the letters. The Attorney General's letter and the spokesperson's

13

comment about it do not accuse Plaintiff (except perhaps to imply, truthfully, that any personnel involved would be investigated).  The Attorney General's statement that the loss of data was "extremely troubling" was no more than the Attorney General's opinion of the conduct which resulted in the loss of data, conduct which the Attorney General could, but did not, link to Wiese.  Simply put, with the falsity of the allegedly leaked information not in dispute, Plaintiff cannot predicate his stigma-plus claim on Kelley's alleged communications with Dicker.

I recognize that I must examine the series of statements in context, mindful of the possibility that Defendant may have stigmatized Plaintiff not overtly, but through a "subtle campaign." *Patterson,* 370 F.3d at 334.  Looking at all the statements together and in context, however, they cannot reasonably be read as anything more than a public agency making clear that it did not want in the sensitive position of IG/VP someone who was under investigation.  Such a statement is simply not stigmatizing under the law governing "stigma-plus" due process claims under § 1983.

### b.     Characterizations in Dicker Articles

Plaintiff also asserts that Defendant should be held responsible for stigmatizing statements appearing in the Dicker articles.  Unlike the Wiese letters, at least one of the Dicker articles contained an unflattering description of Plaintiff, characterizing him as "shadowy" and a "central figure" in the Troopergate "conspiracy." (Am. Compl. ¶ 11.)  Although Dicker may have taken journalistic liberties with information allegedly provided to him by Defendant, and the Dicker articles may have overtly implied that Plaintiff was somehow involved in Troopergate, neither Defendant nor the Authority can be "responsible for the ultimate use or distortion of information . . . release[d] to the public," as "[t]o hold otherwise would severely

limit the ability of government agencies and entities to communicate with the public." *Jones v. Dep't of Educ.,* No. 05-CV-3075, 2008 WL 3836122, at *4 (E.D.N.Y. Aug. 13, 2008); *see also Sacco v. Pataki,* 114 F. Supp. 2d 264, 270 (S.D.N.Y. 2000) ("The Second Circuit has recognized the importance of not discouraging government officials from publicly explaining their personnel decisions.").

As an initial matter, the characterization of the letters as having been "leaked" is questionable. Plaintiff does not allege that they were private by law or otherwise privileged, or that there was any legal impediment to Defendant providing them to whomever he chose. Indeed, that a NYPA spokesperson commented about them undermines any suggestion that the disclosures were secret, back-channel "leaks," as opposed to simply to a public agency providing information about its actions.

In any event, Kelley cannot be held responsible for Dicker's characterizations. The court's reasoning in *Jones* is instructive. In *Jones,* the New York City Department of Education ("DOE") issued a press release announcing that it had removed forty-five principals "for 'poor performance' and that these principals 'had received or were in danger of receiving unsatisfactory ratings in their performance ratings.'" *Jones,* 2008 WL 3836122, at *1. Although the original press release did not contain the names of the terminated principals, the DOE released the names two weeks later after being served with a Freedom of Information Law request. *Id*. at *2. Various newspapers picked up the names, and published articles naming, among others, plaintiff Cheryl Jones as one of the removed principals. *Id*. Jones – who was reported to have been fired when in fact she retired with a satisfactory rating – sued the DOE,

alleging that the press release and subsequent media coverage constituted deprivations of property and liberty interests in violation of the Due Process Clause.  *Id.* at *1.

The court in *Jones* drew a distinction between information directly attributable to the DOE and statements made by the media, observing that Jones's complaint "fail[ed] to allege facts sufficient to establish that the DOE made the stigmatizing statements or that the statements should be attributed to the DOE."  *Id.* at *4.  The DOE itself, the court explained, "did not make the stigmatizing statements about [Jones]." *Id*.  Similarly, and as noted above, Kelley made no stigmatizing or defamatory statements about Wiese.  The court in *Jones* explained that in the absence of directly stigmatizing statements made by the defendant, Jones's "claim is viable *only* if the [defendant] was *affirmatively involved* with the publication and dissemination of the newspaper articles at issue." *Id.* (emphasis added).

Plaintiff attempts to distinguish *Jones* on the ground that he, unlike the *Jones* plaintiff, alleges that Defendant acted in concert with the reporter and substantively assisted him. (Plaintiff's Memorandum of Law in Opposition to Def.'s Mem. ("Pl.'s Mem.") 22.)  Plaintiff greatly overstates his own allegations.  While he claims in his brief that Defendant and Dicker shared a "symbiotic politically charged relationship . . . with the joint objective of destroying [his] reputation in conjunction with his pretextual termination,"  (*id*. 14), no such allegation appears in Plaintiff's Amended Complaint.  While the Amended Complaint does allege that Defendant intended that Dicker report the information in the "leaked" letters, (Am. Compl. ¶¶ 4, 9, 10, 11, 16, 19), it does not allege that the disparaging verbiage (such as "shadowy" or "conspiracy") was intended or facilitated by Defendant, or that Defendant and Dicker had any agreement to smear Plaintiff.  *See Jones*, 2008 WL 3836122, at *4 (no allegation that defendant

16

and reporter shared "an agency relationship," or "that the newspaper published the [allegedly defamatory material] at [defendant's] request").  Plaintiff has thus "failed to allege any facts indicative of . . . [Kelley's] involvement with the newspapers' publication of [the] unflattering [statements]."  *Id.* at *4.

Moreover, not only does Plaintiff's allegation that Kelley and Dicker worked "in tandem" appear only in his brief but not in his Amended Complaint, (*see* Pl.'s Mem. 21), but also the allegations in the Amended Complaint coming closest to (but still falling short of) such a theory are mere "labels and conclusions." *Twombly,* 550 U.S. at 555.  A "[t]hreadbare recital[]" that Defendant intended to destroy Plaintiff's future by providing information to Dicker for republication does not meet *Iqbal*'s requirement that Plaintiff plead facts that are more than "merely consistent with . . . defendant's liability." *Iqbal*, 129 S. Ct. at 1949 (internal quotation marks omitted).  Plaintiff's complaint, which "tenders naked assertions devoid of further factual enhancement," *id.* (internal quotation marks omitted), fails to articulate any factual basis for Kelley's communication with, let alone his "leaking" of information to Dicker, *see Twombly,* 550 U.S. at 555 (plaintiff's "pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action" (internal quotation marks omitted) (alterations in original)).  In the absence of any allegation charging Kelley with doing something more than merely "leaking" information – both public and true – to the press, Plaintiff's Amended Complaint "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly,* 550 U.S. at 557).  The Due Process Clause is simply not implicated by a complaint that alleges nothing more than the

alleged leak of true information to the press, and no "affirmative involve[ment]" by the Defendant in the publication of stigmatizing remarks.

In the absence of any specific allegations of a relationship between Defendant and Dicker, and nothing in Plaintiff's Amended Complaint to suggest that Defendant did more than leak or merely "enabl[e]" Dicker to write the articles that allegedly stigmatized Plaintiff (Am. Compl. ¶ 4), the Court cannot hold Defendant responsible for unflattering statements made about Plaintiff by Dicker. To hold otherwise would not only limit open communication between government agencies and the public regarding personnel decisions, but could effectively discourage government agencies from making personnel decisions in the first place, particularly when under any public scrutiny.

### 2. Qualified Immunity

Having found that the Wiese letters, even if "leaked" to the press, contained no statements capable of being proven false, and that Defendant cannot be held vicariously liable for statements made by Dicker in the absence of any allegations that he was "affirmatively involved" in the publication of these statements, the Court need not reach Defendant's argument that he is entitled to qualified immunity.[5]  I note, however, without deciding, that in the absence of any allegation that it was unlawful to "leak" the letters and any controlling authority that a

---

[5] The Court dismisses Plaintiff's claims with prejudice, as it is evident that granting Plaintiff further leave to amend would be futile. The Court previously permitted Plaintiff to amend his original Complaint after being served with Defendant's pre-motion letter, which made Plaintiff aware of the fact that Defendant intended to argue that, among other things, none of the allegedly leaked statements were false. (Doc. 5.) Plaintiff's Amended Complaint failed to address the deficiencies identified in Defendant's pre-motion letter – deficiencies that Judge Kenneth M. Karas, to whom this case was previously assigned, also brought to Plaintiff's attention. (Doc. 7.)

leaker would be responsible for comments by the leakee that go beyond the leaked material, it appears that Defendant would be qualifiedly immune. *See Kelsey v. County of Schoharie,* 567 F.3d 54, 60-61 (2d Cir. 2009) (under doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" (internal quotation marks omitted)); *McKelvie v. Cooper,* 190 F.3d 58, 62 (2d Cir. 1999) (officers entitled to qualified immunity if "they had an objectively reasonable basis to assume that their conduct was not contrary to [clearly-established] federal law").

## III. Conclusion

For the reasons set forth above, Defendant's Motion to Dismiss is granted. The Clerk of Court is respectfully directed to terminate the pending motion (Doc. 12), and close the case.

### SO ORDERED.

Dated: September 10, 2009
       White Plains, New York

*Cathy Seibel*
CATHY SEIBEL, U.S.D.J.